THE BOARD OF EDUCATION OF THE CITY OF NASHVILLE, *et al.*
*v.* W. C. DODSON, SUPERINTENDENT OF DAVIDSON COUN-
TY PUBLIC SCHOOLS, *et al.*

(*Nashville.* December Term, 1927.)

Opinion filed July 14, 1928.

**SCHOOLS. SCHOOL TERMS. SCHOOL FUNDS. DAILY AVER-
AGE ATTENDANCE.**

In a suit involving the apportionment of State and County Ele-
mentary school funds between a county and a municipality with-
in said county, only the daily average attendance of students
during the regular school terms shall be used as a basis for
calculating such apportionment, even though the municipal
schools have a fourth term during the summer months, primarily
for the purpose of assisting pupils who are backward in their
studies, but which any student may attend. (Post, p. 517.)

Citing ch. 118, Acts 1918, ch. 115, Acts 1925.

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County.
—HON. JAMES B. NEWMAN, Chancellor.

AUST, CORNELIUS & WADE, A. G. EWING and H. A.
LUCK, for complainants, appellants.

HORACE OSMENT and CHAS. C. TRABUE, for defendants, appellees.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

This is a controversy between the City of Nashville and Davidson County as to the proportion of the State and County Elementary School funds the former is entitled to.

By the provisions of chapter 118, Acts of 1921, and chapter 115, Acts of 1925, these funds are to be apportioned each year in proportion to the average daily attendance in the elementary schools for the previous year.

Prior to 1924, the Nashville Public Schools had three twelve-week terms during each fiscal year (July 1st to June 30th), beginning in September and running to June. Effective July 1, 1924, a fourth term was added, beginning July 1st and running twelve weeks to the September term. In other words, after that date the Nashville Schools had an "all year school."

The average daily attendance in the City Elementary Schools for 1926-1927, if the summer or fourth term is excluded, was 16,977. The average daily attendance at the summer term is about half that at the other three terms. If the summer term is included the average daily attendance would be 14,756, making a difference of 2,231, and resulting in a loss of something like $35,000 each year to the City schools.

It follows that the question for decision is, did the Legislature intend that the average attendance at this summer term should be included in determining "the average daily attendance for the previous year?"

It is certain that the Legislature did not have this new or extra term specifically in mind, because it had not been created, and was a new venture in the Elementary School system. On the other hand, the Legislature did not have in mind any definite period within the fiscal year that the schools should operate.

By the Act of 1925 it was provided that eight months should be the minimum term, but the school authorities were authorized to extend the session or increase the length of the teaching year beyond that period.

It seems perfectly clear to us that the Legislature intended that the computation should be based upon the average daily attendance during the time that the school was operated within the fiscal year in the regular and ordinary manner. If the added fourth term was substantially similar to the other three terms, then it should be included, even though, incidentally, the authorities departed from the regulations and permitted a few deficient or delinquent pupils to take only one or two studies, rather than the regular full course.

On the other hand, if the primary purpose of the summer term was to enable those who had failed in one or two studies to make up their losses, and, incidentally, permitted ambitious students to take the regular course and thereby advance their standing, then this summer term was special and not regular, and was not contemplated by the Legislature in fixing the basis upon which these funds should be distributed. It is not even contended by the defendants that if the summer session was limited to one or two studies that it should be included in the computation.

It becomes necessary, therefore, to consider the evidence with a view of determining the nature and character of this new summer term.

The only witness who gives any substantial testimony upon this question is Professor H. C. Weber, who is the originator of this system, and who has filled the position of Superintendent of the Nashville City Schools for more than ten years. He testified as follows:

"Q. 42. In the beginning of the vacation schools or opportunity schools, I wish you would group the sort of pupils that attended these schools, that is, were they backward, or those that had failed in the examinations, etc.? A. I will have to go into a little detail to explain that. We promote now down to the sixth grade by subject, rather than by averaging all the subjects. That of necessity would leave large numbers of children stranded in one or more subjects. This class comes to take advantage of the opportunity of the summer school to make up those particular branches in which they failed in the regular school year, to enable them to take their places regularly with their classmates in the fall. Also those pupils below the seventh grade, where promotion is made on average, if they fail they can come. Also such pupils that may have passed on arbitrary average, but who might be deficient in some one subject, are allowed to come and take that particular subject. Also those pupils who from any cause have been delayed in their education until they are over age for the class that they are in, come and do twelve weeks work so as to enable them to catch up with children of their age. There is however, no restriction put; since it is a public school it is open to any that wish voluntarily to come.

"Q. 43. To use a scriptural phrase 'all who will may come.' Is that true? A. Yes, sir, all who will may come.

"Q. 44. Isn't that last class, that is all who will may come, who are not backward for the reasons you have enumerated, the only new class of pupils that are permitted in this vacation school from what were admitted in these vacation schools when you began them? A. There is no difference; no class attends the present vacation schools now that did not attend them before. It is the same.

"Q. 45. Is that true in other States? A. I think so. We discourage here anybody coming who are already up with their work; we do not say they shall not come, but we will send for the parents and say to them 'these children should not come, but it is public, send your children if you want to.'

"Q. 46. What is the school year as understood or in practice in your city schools of Nashville? A. The school year, and school session are synonymous terms in the academic world.

"Q. 47. What do you mean by your school or schools being in session? A. Running for that length of time it is necessary to do a conventional school year's work or grade.

.    .    .    .    .    .    .    .    .

"Q. 57. Is any effort made to compel pupils to attend the vacation or summer school? A. No; because there is no law for it.

"Q. 58. What hours do the pupils attend the regular school session? A. From nine to two in some grades; eight-forty to two in some grades, and eight-forty to two-thirty in others.

"Q. 59. Is that attendance required to be continuous while the school is in operation? That is, during those entire hours are the pupils required to be in continuous attendance? A. Yes, unless excused for emergency, as in the case of sickness.

"Q. 60. They can only get out those hours upon such excuse? A. Yes, sir, and the excuse does not hold good from day to day in emergency.

"Q. 61. Does the course of study in the regular school session embrace required subjects and also any other subjects in addition to the majors, are there required studies? A. The State law requires certain studies to be taught, leaving to the cities to teach others if they wish. The Nashville schools comply with this law, and take advantage of teaching things that the law does not require.

. . . . . . .

"Q. 63. I will change that; just strike that question out. It is hard to say what I want to say without making some observation. If a pupil has failed on a subject during the regular term, in the fall or winter term, or spring term, what effect does that have on the student's making up for that failure or going forward with his class until he reaches the end of the regular session? A. You will have to read that for me again.

"Q. 64. (The question was here read by the reporter). A. That depends upon the grade he is in. In those grades where promotion is made by subjects he goes on in all of those things that he is capable of going on in, and he can then at this opportunity term make that part up and take his regular place again.

157 Tenn.—33.

"Q. 65. Now, is he permitted to make up that lost time during the regular term? A. If he goes back another term, yes.

"Q. 66. Would that not result in a very serious loss to the pupil to do that? A. Yes, sir.

"Q. 67. I wish, now, Mr. Weber, you would state what the difference is between the regular session and the extra or summer school, or opportunity school, as adopted by the City of Nashville, and as is operated in the City of Nashville. A. The school session, or school year, comprises the same length of time it always did, nine months, beginning in the fall, it closes in the spring, as it always did; the regular school session, or year, is divided into three parts, in which time the grade's work, the year's work, is completed. In the vacation school, or term, the extra term, as it is designated in the Book of Rules, runs twelve weeks, the same length of time as one of the terms in the regular school session. The summer terms allow all sorts of irregularities. The child who is behind in one subject can come and take one subject, or two subjects during the regular session he has to take the prescribed course; the summer term is entirely voluntary; the regular session, composed of three terms, is compulsory, under the law, and it is attempted to enforce this law rigidly. On account of irregularities already mentioned, and on account of those subjects not regarded as essential, or not necessarily correlated with work to follow, are omitted in the summer term. This enables the schools to run fewer hours for the school day during the summer term. The weather allows the schools to open earlier. The two together make it possible for the schools to dismiss two hours earlier.

"Q. 68. Are pupils, too, permitted to go when they have finished their recitations on their subject or subjects? A. If they are not taking the full course, in the summer term, yes.

"Q. 69. Is that true of the regular sessions? A. No, sir; because none, in the winter time, are allowed to take fewer than the four. The regular session is, as explained before, divided into three terms. This extra term in the summer not only is different from the others, as explained, but it is a time in which they may do a third of their regular school year's work. This very fact has made the summer term in Nashville available and desirable to larger numbers of children than cities running the summer term shorter than their subdivision of the regular school year.

"Q. 70. Is a pupil required, or not, when he enters the extra term school, to take a complete grade course, or may he take a part of a grade? A. He takes a part of a grade, if that part taken would help to straighten him out in his course so that he would be uniform with his class later.

"Q. 71. Is that same arrangement permissible in the regular session? A. No, sir, it could not be. You would disorganize your whole machinery. It is permissible in the summer term, because there are fewer children in proportion to the teachers.

. . . . . . .

"Q. 74. Is a pupil who is taking one or more courses in the summer time required to appear at the hour of assembly of the school, or does he appear at the hour of assembly for his class in which that subject is being taught? A. All pupils in the summer term not taking the full course are allowed to come when their first les-

sons occurs, and leave at the end of their last lesson; this is not allowed in the regular session.

"Q. 75. Is it or not the purpose of the running of the summer or opportunity school, to make the school as irregular as the needs of the pupils, so as to meet the individual need of each and every pupil who attends? A. Yes, sir, I answered that before, I think, when I said that there were fewer number of children attending than during the regular school, and all sorts of irregularities are permitted that could not be permitted during the regular school session without disrupting the machinery and thereby increasing largely the cost.

. . . . . . . .

"Q. 91. And what is the primary purpose of the summer extra school of the City School system of Nashville? A. The primary purpose is to offer opportunities to those unfortunates that have not kept up with their work, so as to enable them to get through school, if they will, in their regulation time prescribed regularly. It has incidental advantages, such as making up lost time by overaged pupils.

. . . . . . . .

"Q. 95. What is that meaning? A. The word session means that length of time required to do a school year's work, in public school parlance, a grade's work."

This witness further testified that the length of the summer term was the same as the others, that the same subjects were taught, and that a pupil successfully completing the full course was given credit therefor and could cut either of the other three quarters; but he added that he had never known a pupil doing this.

In view of the foregoing, notwithstanding the similarities pointed out by the witness, we think there is a dis-

tinct difference between the summer and the other terms, and that the Legislature could not have had in mind such an irregular and unusual term as that detailed by the witness. Mr. Weber states positively that the primary purpose of this term was to aid those who were backward and behind in their classes, and that they discouraged pupils from taking the regular and full course where it was not necessary. The witness was not asked as to the number of pupils taking the regular or full course at the summer sessions. Such information might have been of value, in determining the nature of the summer term.

Many questions have been raised and argued by counsel that we have not responded to for the reason that we do not consider them germane to the controversy.

In our opinion, the chancellor committed error in dismissing the bill, and his decree will be reversed and the defendants enjoined from including the summer terms in computing the average daily attendance for the fiscal years 1926-1927 and 1927-1928.

The complainants also seek a decree for funds withheld from them for the years 1924-1925 and 1925-1926.

The defendants rely upon an estoppel. The only evidence upon which the estoppel is predicated is the hearsay testimony of Mr. Weber that he heard so and so. The amount involved is large, and was expended by the County upon the advice of the Attorney-General of the State, a fact which, it is alleged, was known to and acquiesced in by the City.

In these circumstances, we feel constrained to remand the cause for further evidence and a hearing upon this issue.

The cost of the appeal will be paid by the defendants. Other costs will be decreed by the chancellor upon the final hearing.